IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

C.A. No. 14-16990

JAMES AND KATHERINE MCCALMONT,

Plaintiffs-Appellants,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION,

Defendant-Appellee

**PLAINTIFFS-APPELLANTS JAMES AND KATHERINE MCCALMONT'S OPENING BRIEF**

Appeal from the Judgment of the United States District Court for Arizona
D.C. No. 13-cv-02107
(Honorable H. Russell Holland)
_____

PAUL MENGEDOTH
AZ Bar No. 018507
MENGEDOTH LAW PLLC
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Tel: (480) 778-9100
Fax: (480) 778-9101
E-mail: paul@mengedothlaw.com

SYLVIA A. GOLDSMITH
OH Bar No. 0064871
GOLDSMITH & ASSOCIATES, LLC
20545 Center Ridge Road, Ste. 120
Rocky River, OH 44116
Tel: (440) 934-3025
Fax: (440) 934-3026
E-mail: goldsmith@goldsmithlawyers.com

*Attorneys for Plaintiffs-Appellants*
JAMES AND KATHERINE MCCALMONT

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................... ii

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................1

PERTINENT STATUTES .................................................................2

STATEMENT OF THE CASE ...........................................................4
   I.   RELEVANT FACTUAL BACKGROUND. ................................4
     A.   Fannie Mae's Role In The Residential Mortgage Market. .........4
     B.   The Housing Market Collapses.............................................5
     C.   The McCalmonts Are Shut Out Of The Conventional Mortgage Market
     Because Of False Desktop Underwriter Findings Insisting They Had A
     Foreclosure. ...................................................................6
   II.   PROCEDURAL HISTORY...................................................8

SUMMARY OF ARGUMENT...........................................................12

ARGUMENT ...................................................................................14
   I.   STANDARD OF REVIEW. ..................................................14
   II.   THE DISTRICT COURT ERRED BY IMPROPERLY RELYING ON
       "EVIDENCE" IT CONCLUSIVELY ACCEPTED AS FACT ON A RULE
       12(B)(6) MOTION TO DISMISS...........................................15
   III.   THE COMPLAINT SETS FORTH SUBSTANTIAL FACTS
       DEMONSTRATING THAT THE FCRA'S BROAD DEFINITIONS OF
       "CONSUMER REPORTING AGENCY" AND "CONSUMER REPORT"
       APPLY HERE...................................................................21
     A.   The McCalmonts Have Sufficiently Pled The Existence Of A "Consumer
     Report."..........................................................................22
     B.   The Complaint Sets Forth Facts Sufficient To Show Fannie Mae Is A
     "Consumer Reporting Agency."..........................................27

CONCLUSION ...............................................................................30

STATEMENT OF RELATED CASES.................................................30

CERTIFICATE OF SERVICE.............................................................32

## TABLE OF AUTHORITIES

Cases

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)............15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ................................................................................................14, 15

*Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151 (11th Cir. 1991) .......16

*Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034 (9th Cir. 2011)........14

*Conservation Force v. Salazar*, 646 F.3d 1240 (9th Cir.2011), cert. denied, *Blasquez v. Salazar*, —— U.S. ——, 132 S.Ct. 1762, 182 L.Ed.2d 532 (2012) ................................................................................................14

*Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409 (4th Cir. 2001) ................29

*Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147 (9th Cir. 2009)...................29

*Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329 (9th Cir. 1995)...............16

*Holmes v. Telecheck Int'l, Inc.*, 556 F.Supp.2d 819 (M.D. Tenn. 2008) ...............25

*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008).............14

*Moss v. U.S. Secret Serv.*, 572 F.3d 962 (9th Cir.2009).........................................15

*Nunnaly, Jr. v. Equifax Information Services, LLC*, 451 F.3d 768 (11th Cir. 2006) ................................................................................................23

*Ortiz v. Lyon Mgmt. Group, Inc.*, 69 Cal. Rptr. 3d 66 (Cal. Ct. App. 2007)...........24

*OSU Student Alliance v. Ray*, 699 F.3d 1053 (9th Cir. 2012) .................................16

*Pinnacle Armor, Inc. v. United States*, 648 F.3d 708 (9th Cir. 2011) .....................16

*Safeco Ins. Co. of Amer. v. Burr*, 551 U.S. 47 (2007)............................................29

*Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) ...............15

*Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204 (9th Cir.2013) .........................14

*Trans Union Corp. v. Fed. Trade Comm'n*, 245 F.3d 809 (D.C. Cir. 2001)...........24

*Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971 (7th Cir. 2004)...29

*Yang v. Gov't Employees Ins. Co.*, 146 F.3d 1320 (11th Cir. 1998) .......................24

*Zabriskie v. Federal National Mortgage Association, et al.*, unreported, 2:13-cv-02260, D. AZ (J. Bolton, April 17, 2014)................................................26, 29, 30

Statutes

15 U.S. C. § 1681(a)(4) .......................................................................................30
15 U.S.C. § 1681*a*(d)...............................................................22, 23, 24, 25
15 U.S.C. § 1681*a*(f) ....................................................................27, 28, 29
15 U.S.C. § 1681*a*(u)......................................................................................18
28 U.S.C. § 1291 ...............................................................................................1
28 U.S.C. § 1331 ...............................................................................................1

Other Authorities

FTC, *40 Years of Experience with the Fair Credit Reporting: An FTC Staff Report with Summary of Interpretations* (2011) .............................................................20

Rules

FRAP 4(a)(1)(A) ...................................................................................................1

## JURISDICTIONAL STATEMENT

The instant case was brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., thereby giving the district court subject matter jurisdiction under 28 U.S.C. § 1331. The district court granted Defendant-Appellee's *Motion to Dismiss* by *Order* dated July 21, 2014. Plaintiffs-Appellants timely moved to reconsider that order pursuant to Rule 59 of the Federal Rules of Civil Procedure. The district court's judgment denying Plaintiffs-Appellants' *Motion to Alter or Amend Judgment* is an appealable final decision, and was entered on September 24, 2014. Plaintiffs-Appellants timely filed their *Notice of Appeal* on October 14, 2014. *See* Fed.R.App.P. 4(a)(1)(A). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether the district court erred by relying on "evidence" it conclusively accepted as fact in deciding contrary to Plaintiffs-Appellants' plausibly suggestive allegations that Fannie Mae is a consumer reporting agency subject to the mandates of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* when it prepares Desktop Underwriter Findings Reports for sale to lenders and/or brokers throughout the United States for purposes of assisting in the evaluation of a consumer's eligibility for a residential mortgage loan.

## **PERTINENT STATUTES**

**15 U.S. C. § 1681(a)(4)**:

There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

**15 U.S.C. § 1681*a*(d)**:

Consumer Report.—

> (1) In general.— The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—

>> (A) credit or insurance to be used primarily for personal, family, or household purposes;

>> (B) employment purposes; or

>> (C) any other purpose authorized under section 1681b of this title.

**15 U.S.C. § 1681*a*(f)**:

The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer

**15 U.S.C. § 1681*a*(u)**

Reseller.— The term "reseller" means a consumer reporting agency that—

> (1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and

> (2) does not maintain a database of the assembled or merged information from which new consumer reports are produced.

**15 U.S.C. § 1681*e*(b)**:

Accuracy of report

Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

## STATEMENT OF THE CASE

### I.   RELEVANT FACTUAL BACKGROUND.

#### A.   Fannie Mae's Role In The Residential Mortgage Market.

Defendant-Appellant, Federal National Mortgage Association ("Fannie Mae"), plays a silent role in the home loan origination process in addition to its role in the secondary mortgage market, influencing the decisions of mortgage brokers and lenders as to whether to approve a potential homeowner for a residential mortgage. [Excerpts of Record ("EOR") at 191, ¶ 2].

At the heart of Fannie Mae's influence is its automated underwriting system, Desktop Underwriter ("DU"), which it requires lenders to use if they want Fannie Mae to purchase their mortgages on the secondary market. [EOR at 195, ¶ 18]. Through this system Fannie Mae obtains, reviews and evaluates consumer credit information in advance of loan origination for its own underwriting purposes so as to provide a recommendation to the lender or broker as to whether Fannie Mae will purchase a particular mortgage loan if made. [EOR at 191, ¶ 2]. Fannie Mae charges a fee to the lender or broker for a recommendation generated through its DU system. *Id.*

As part of this process, Fannie Mae obtains a potential homeowner's three-file or "tri-merge" consumer report from either a reseller of credit information or one the three main credit bureaus. [EOR at 195, ¶ 21]. The DU system then

4

assembles, reviews, assesses and evaluates this information, along with other borrower-specific information supplied by the mortgage lender or broker, and generates its own distinct report known as the Desktop Underwriting Findings Report. [EOR at 195-96, ¶¶ 21-22]. This consumer report contains Fannie Mae's own findings, conclusions, comments and results as to the eligibility of that applicant's loan for purchase by Fannie Mae as well as a Fannie Mae's recommendation as to whether and on what terms the lender should extend the consumer credit. [EOR at 196, ¶ 23]. If Fannie Mae suggests the loan be made, the Desktop Underwriter Findings Report provides an "APPROVED" recommendation; otherwise, a "REFERRED WITH CAUTION" recommendation is provided suggesting Fannie Mae would not purchase that particular loan if made.

### B. **The Housing Market Collapses.**

In 2007, the United States economy suffered a dramatic downturn. The housing bubble burst, and there was a significant negative domino effect in the lending industry as well as the investment market. Hoards of homeowners found themselves obligated on mortgages significantly greater than the values of their underlying homes.

Short sales – a lender-approved sale of a home for less than the outstanding mortgage amount – emerged as a leading response to the growing crisis. By 2012, the Federal Housing Finance Agency announced measures to

make short sales easier for owners of underwater homes. The significant growth in approved short sales has helped buoy the housing market and push distressed house prices higher in the past few years.

While a short sale allows the homeowner to sever ties with a property he or she can no longer afford, or want, to stay in, it certainly is not without consequence for him or her. Among other things, a short sale is a significantly derogatory event in an individual's credit history. A short sale will prevent the homeowner's ability to obtain mortgage financing for a period of time. Fannie Mae, for instance, will not even consider purchasing a mortgage loan if the underlying applicant has had a short sale in the two (2) years prior to a mortgage application. [EOR at 238].

### C. The McCalmonts Are Shut Out Of The Conventional Mortgage Market Because Of False Desktop Underwriter Findings Insisting They Had A Foreclosure.

The McCalmonts owned a property that was subject to two mortgages, the first with Chase Bank and the second with Wells Fargo Bank. [EOR at 197, ¶ 28]. After an attempt to enter into a loan modification failed, the McCalmonts negotiated a short sale on October 26, 2009. [EOR at 197-98, ¶¶ 30-34]. Per the DU Guidelines, the McCalmonts understood they would be unable to get a new mortgage loan for two years. [EOR at 198, ¶ 35].

In October 2011, having waited the mandatory two years, the McCalmonts contacted Pinnacle Lending to obtain pre-qualification for financing to buy a new home. [EOR at 198, ¶ 36]. While they discovered that the close of escrow date on their short sale was entered incorrectly as January 2010, so any financing of a home purchase would have to wait until January 2012, *id.,* Pinnacle Lending informed the McCalmonts that they would not be approved for a loan regardless because their short sale had been flagged as a foreclosure. [EOR at 199, ¶ 39]. No record of a foreclosure existed on any consumer report produced by the three (3) national credit bureaus, Equifax, Experian or Trans Union. [EOR at 199, ¶ 41].

Hopeful and undeterred, the McCalmonts contacted another lender in attempt to purchase a different property a few months later. They successfully obtained a pre-qualification letter and had an expected closing date in March 2012. [EOR at 200, ¶¶ 43-46]. The McCalmonts were devastated to find out they were again turned down for a mortgage on March 1, 2012. [EOR at 200, ¶¶ 47-48]. As with their first attempt to buy a home, the McCalmonts were advised that their loan had been denied because of a foreclosure in the previous seven (7) years. [EOR at 200, ¶ 49].

The McCalmonts successfully purchased a home only after obtaining a hard-money personal loan with much less favorable terms than conventional mortgage financing. [EOR at 201-202, ¶¶ 53-58]. Over the next several months, they

7

desperately looked for answers as to why their short sale was reported as a foreclosure in hopes to refinance this purchase as quickly as possible. [EOR at 202, ¶¶ 59-60].

Eventually, the McCalmonts were able to obtain a copy of one the Desktop Underwriter Findings Reports from one of their prospective lenders, Homeowners Financial Group. [EOR at 204, ¶ 67]. Despite the fact that the Desktop Underwriter Findings Report correctly identified the McCalmonts' short sale in 2009, the report further concluded that the McCalmonts were not "eligible" for conventional mortgage financing because of a foreclosure in the previous seven (7) years. [EOR at 204, ¶¶ 67-68]. Homeowners Financial Group also shared a copy of the McCalmonts tri-merge consumer report which, as expected, revealed no foreclosure. [EOR at 205, at ¶¶ 70-71].

To date, the McCalmonts have remained unable to refinance their home because Fannie Mae continues to identify them, albeit falsely, as having had a foreclosure.

## II.  <u>PROCEDURAL HISTORY.</u>

On October 16, 2013, the McCalmonts filed their Complaint pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* [EOR at 258, Dkt. No. 1]. The Complaint alleges that Fannie Mae is a consumer reporting agency subject to the mandates of the FCRA in connection with the preparation of its

Desktop Underwriter Findings Report for sale to lenders and/or brokers throughout the United States for purposes of assisting in the evaluation of a consumer's eligibility for a residential mortgage loan. [EOR at 209-11, at <u>Claims</u>].

On January 13, 2014, Fannie Mae filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [EOR at 259, Dkt. No. 14]. In its motion, Fannie Mae concedes through its own admission:

> [Desktop Underwriter] … "assembles, reviews, assesses and evaluates" the loan application-information and the credit data provided by the reporting agency, and "generates its own report" known as the DU Findings, which "provides a preliminary assessment of whether the loan would meet Fannie Mae's eligibility requirements for purchase."

[EOR at 129-30].

On April 11, 2014, the McCalmonts opposed this motion, outlining in great detail how the Complaint sets forth allegations plausibly suggesting their entitlement to relief under the FCRA. [EOR at 260, Dkt. No. 25].

On April 17, 2014, an Arizona district court hearing another case with substantially similar facts and claims *denied* Fannie Mae's virtually identical motion to dismiss. *See Zabriskie v. Federal National Mortgage Association*, *et al.*, unreported, 2:13-cv-02260, D. AZ (J. Bolton, April 17, 2014).[1] In ruling that Fannie Mae was a consumer reporting agency as defined under the FCRA, Judge

---

[1] In light of this ruling, the McCalmonts filed a motion for leave to file Supplemental Argument and Authority, which the district court granted, to bring the *Zabriskie* decision to the court's attention. [EOR at 260, Dkt. No. 28].

Bolton noted that "there is little room for doubt that Fannie Mae's actions fall within the scope of the Act's protection." *Id.* at 8.

On July 10, 2014, telephonic oral arguments were held. [EOR at 261, Dkt. No. 37]. During same, Judge Holland posed several clarifying questions to Fannie Mae's counsel who volunteered testimony as to his personal understanding of how Fannie Mae's Desktop Underwriter system works. [EOR at 57-59].

On July 21, 2014, the district court entered its Order granting Fannie Mae's motion to dismiss for failure to state a claim, concluding that Fannie Mae is not a consumer reporting agency as defined by the FCRA and reciting much of Fannie Mae's counsel's testimony in support of the court's decision. [EOR at 261, Dkt. No. 39]. For instance, the court volunteered that "[a]s explained by counsel at oral argument, the lender obtains an applicant's tri-merge consumer report from the three major credit reporting agencies, Equifax, Trans Union and Experian. This information, along with other information provided by the applicant, is entered in the DU system by the lender." [EOR at 5]. The court repeated this statement when it found that "[i]t is *not* Fannie Mae that is assembling and evaluating the applicant's information. Rather, it is the software that Fannie Mae has licensed or leased to the lender which is assembles or analyzes [sic] the applicant's information." [EOR at 12] (emphasis original).

On August 18, 2014, the McCalmonts filed a motion to alter or amend judgment pursuant to Rule 59(e). [EOR at 261, Dkt. No. 42]. The McCalmonts provided to the court the Affidavit of Lisa Lund, President of the Arizona Association of Mortgage Professionals, as proffer contradicting much of the "evidence" the district court accepted as fact on the motion to dismiss. [EOR at 49-50, ¶¶ 5, 8-10, 11].

On September 5, 2014, Fannie Mae responded. [EOR at 261, Dkt. No. 44].

On September 24, 2014, the district court entered its Order denying the McCalmonts motion to alter or amend. [EOR at 261, Dkt. No. 45].

Within the time permitted by Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure, the McCalmonts filed the instant appeal. [EOR at 261, Dkt. No. 46].

## SUMMARY OF ARGUMENT

1.    The McCalmonts brought a singular claim against Fannie Mae setting forth a sufficient factual basis to plausibly suggest a *prima facie* case under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* The Complaint avers that Fannie Mae is a consumer reporting agency subject to the mandates of the FCRA in connection with the preparation of its Desktop Underwriter Findings Report for sale to lenders and/or brokers throughout the United States for purposes of assisting in the evaluation of a consumer's eligibility for a residential mortgage loan.

2.    Despite abundant fact-rich allegations to the contrary, the district court dismissed the McCalmonts' Complaint concluding that Fannie Mae is not a consumer reporting agency because, in the court's opinion, it does not assemble or evaluate consumer information. In order to reach this conclusion, the district court improperly rejected the well-pled allegations of the Complaint and instead, accepted as true considerable "evidence" outside the pleadings.

3.    The Complaint contains a plethora of facts pled with specificity as to Fannie Mae's role as a consumer reporting agency including the processes through which it obtains, assembles, reviews and evaluates consumer information for the purposes of providing mortgage brokers and/or lenders with its own consumer report, a Desktop Underwriter Findings Report, which includes findings,

conclusions and recommendations as to whether and on what terms a particular loan should be made.

4.    The McCalmonts are not asking this Court to rule that Fannie Mae is, as a matter of fact or law, a consumer reporting agency or that the Desktop Underwriter Findings Report constitutes a consumer report under the FCRA. Rather, this appeal seeks reversal of the erroneous dismissal of the McCalmonts' Complaint on a Rule 12(b)(6) motion to dismiss so that they may have the opportunity to collect evidence in support of their well-pled claims.

**ARGUMENT**

## I.  **STANDARD OF REVIEW.**

Based on the erroneous factual conclusion that Fannie Mae is not a "consumer reporting agency" as defined by 15 U.S.C. §1681*a*(f), the district court dismissed the Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  District court dismissals for failure to state a claim are reviewed *de novo*.  *See Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1040 (9th Cir. 2011) (*citing Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1102 (9th Cir. 2008)).

A Rule 12(b)(6) dismissal for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory, or (2) insufficient facts to support a cognizable legal claim. *See Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir.2011), cert. denied, *Blasquez v. Salazar*, --- U.S. ---, 132 S.Ct. 1762, 182 L.Ed.2d 532 (2012).  Courts must consider all well-pleaded factual allegations as true and interpret them in the light most favorable to the plaintiff. *See Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204, 1207 (9th Cir.2013).

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683,

40 L.Ed.2d 90 (1974)). However, "for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir.2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). In other words, the complaint must contain enough factual content "to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Twombly*, *supra*, 550 U.S. at 556.

So long as the Complaint alleges plausible facts that could entitle the plaintiff to the relief sought, she should be afforded the chance to build her evidence accordingly. *See Twombly*, *supra*, 550 U.S. at 555.

## II. THE DISTRICT COURT ERRED BY IMPROPERLY RELYING ON "EVIDENCE" IT CONCLUSIVELY ACCEPTED AS FACT ON A RULE 12(B)(6) MOTION TO DISMISS.

The case *sub judice* involves a single claim for relief under the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*  To wit:  the Complaint alleges that Fannie Mae violated the mandates of 15 U.S.C. § 1681*e*(b) by failing to follow reasonable procedures in preparing one or more "Desktop Underwriter Findings Report" that falsely identified the McCalmonts as having a foreclosure, a mistake that prevented (and continues to prevent) the McCalmonts from obtaining a traditional residential mortgage loan for their home. [EOR at 199, 200, 203, 204, 209-11, ¶¶ 39-40, 44-49, 63-65, 69, 89-98].

To make out a prima *facia* case under 15 U.S.C. § 1681*e*(b), a plaintiff must allege facts tending to show that "a [consumer] reporting agency prepared a [consumer] report containing inaccurate information." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)(citing *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991)). Whether the McCalmonts will prove these elements is not the question to be answered on a motion to dismiss (just as considering whether Fannie Mae will prove the elements of any affirmative defenses is premature). The only proper consideration is whether the Complaint alleges "'sufficient factual matter . . . to state a claim to relief that is plausible on its face.'" *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1061 (9th Cir. 2012) (quoting *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 721 (9th Cir. 2011).[2]

In dismissing the Complaint, the district court determined that Fannie Mae is not a "consumer reporting agency" because, in the district court's opinion, "Fannie Mae is not regularly assembling and evaluating consumer information[.]" [EOR at

---

[2] To be clear, the question before this Court is not whether Fannie Mae is (or is not) a consumer reporting agency, or if the Desktop Underwriter Findings Report is (or is not) a consumer report within the meaning of the FCRA. To decide that ultimate issue was not and is not appropriate. The only question to be resolved upon Fannie Mae's Rule 12(b)(6) motion to dismiss was whether the McCalmonts' pled facts plausibly suggestive of a claim entitling them to relief.

14].[3]  To make such a determination, the district court had to go well beyond the allegations of the Complaint that set forth in detail facts plausibly suggesting the *exact opposite*.

For example, the Complaint asserts that "Fannie Mae obtains, reviews and evaluates consumer credit information in advance of loan origination for its own underwriting purposes[.]"  [EOR at 191, ¶ 2]. Elsewhere, the Complaint states "Fannie Mae's DU system assembles, reviews, assesses and evaluates all of the information it obtains from the lender and/or broker * * * and generates its own report, known most frequently as the Desktop Underwriter Findings report[.]" [EOR at 195-96, ¶ 22]. Notably, Fannie Mae uses similar phrases such as "assembles and evaluates credit data" to describe what its *own* Desktop Underwriter (DU) system does.  [EOR at 130].

Nevertheless, the district court judicially resolved the issue in direct contradiction to the allegations of the Complaint:

> It is not Fannie Mae that is assembling and evaluating the applications information.  Rather, it is the software that Fannie Mae has licensed or leased to the lender which is [sic] assembles or analyzes the applicant's information.

---

[3] As will be explored in further detail in Section III, *infra*, the term "consumer reporting agency" is defined in the FCRA as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."  15 U.S.C. § 1681*a*(f).

[EOR at 12]. The district court then used this improper factual determination to conclude that "[b]ecause Fannie Mae is not actively involved in the compilation of the consumer information, it is not regularly assembling and evaluating consumer information and thus it cannot be a 'consumer reporting agency.'" [EOR at 13]. In doing so, the district court not only usurped The McCalmonts' right to put forth evidence in support of its in-depth allegations, but also simultaneously eliminated Fannie Mae's burden to *prove* its defense. This constitutes clear error under the Rule 12(b)(6) standard.[4]

The district court's Order shows on its face how facts and arguments well beyond the allegations of the Complaint swayed the judge's analysis. For instance, the Complaint alleges that Fannie Mae acts as a "reseller" of consumer credit information, [EOR at 192, ¶ 3], and then goes on to allege with specificity how. [EOR at 195, ¶ 21]. ("Fannie Mae obtains an applicant's three-file and/or 'tri-merge' consumer report * * * which Fannie Mae sells to the lender or broker.").[5] Even Fannie Mae acknowledges that "[l]enders . . . through DU obtain a credit report from a consumer reporting agency." [EOR at 129]. But the district court concluded the *exact opposite*:

---

[4] After making its own determination that "Fannie Mae does not regularly assemble or evaluate consumer information," the district court did not consider the remaining elements of the McCalmonts' claim. [EOR at 13, fn. 34].

[5] A reseller is defined in 15 U.S.C. § 1681*a*(u).

18

> It is the lenders which obtain an applicant's credit reports from credit reporting agencies and it is the lenders which input information about the applicant into the DU system[.]

[EOR at 12]. Admittedly, the district court's decision in this regard came directly from representations made by Fannie Mae's counsel at oral argument, seemingly accepted as evidence by the district court, as to how the process works:

> As explained by [Fannie Mae's] counsel at oral argument, the lender obtains an applicant's tri-merge consumer report from the three major credit reporting agencies, Equifax, Trans Union and Experian. This information, along with other information provided by the applicant, is entered into the DU system by the lender.

[EOR at 5].

The district court also erroneously relied on Fannie Mae's counsel's repeated reference to an unauthenticated document to testify as to how the DU system purportedly works. [EOR at 5, fn. 10]. While there is passing reference to the underlying software in the Complaint, the purported licensing agreement lacks any evidentiary support whatsoever. The document was gratuitously submitted by Fannie Mae as an exhibit to its motion to dismiss without any effort to satisfy any of the rules of evidence as to its admissibility, or the propriety of its consideration on a Rule 12(b)(6) Motion to Dismiss.

Moreover, on reconsideration, the McCalmonts proffered the Affidavit of Lisa Lund, the current President of the Arizona Association of Mortgage Professionals, who testified that "Fannie Mae uploads, assembles and evaluates the

information contained in those tri-merge consumer reports" obtained through the DU system.   [EOR at 50, ¶ 11]. At a minimum, this proffer demonstrates the error in the district court's improper resolution of this disputed factual issue.

Led by Fannie Mae with these arguments and "evidence," the district court factually concluded that Fannie Mae is nothing more than a "seller of software" and, as such, is not subject to the FCRA.  [EOR at 13] ("a seller of software to a company that uses the software product to process credit report information is not a CRA because it is not 'assembling or evaluating' any information.").  To reach this conclusion the district court had to disregard the extensive allegations of the Complaint describing how Fannie Mae does much more in the process of creating its Desktop Underwriter Findings Report than merely license its system for use by lenders:

> the DU Findings Report contains findings, conclusions, comments and results reached by Fannie Mae concerning the applicant's credit and his or her 'eligibility' for loan purchase by Fannie Mae, as well as Fannie Mae's recommendation as to whether the lender should grant or originate the loan, deny the loan or approve it subject to certain conditions being satisfied.

[EOR at 196, ¶ 23]. Should these facts prove to be true, there is little question there exists a cognizable claim against Fannie Mae.  *See*, *e.g.*, FTC, *40 Years of Experience with the Fair Credit Reporting: An FTC Staff Report with Summary of Interpretations* (2011) at 29, Section 603(f)(3)(B)(iii)("a company that uses software to assemble, or otherwise assembles, consumer information (other than its

own experiences with the consumer) for transmission to third parties may be a CRA.").  The district court improperly foreclosed the McCalmonts opportunity to do so.

The McCalmonts are not asking this Court to step in and rule as a matter of fact or law that Fannie Mae is a consumer reporting agency.  To do so would be tantamount to the same error committed by the district court.  Instead, the McCalmonts seek reversal of the district court's plain error – error in going far beyond the plausibly suggestive and abundant facts set forth in the Complaint – in order for them to have the opportunity to collect evidence in support of their well-pled claims.

## III.  THE COMPLAINT SETS FORTH SUBSTANTIAL FACTS DEMONSTRATING THAT THE FCRA'S BROAD DEFINITIONS OF "CONSUMER REPORTING AGENCY" AND "CONSUMER REPORT" APPLY HERE.

The FCRA regulates primarily "consumer reporting agencies" and "consumer reports."  Simply put, the Act defines a "consumer reporting agency" (CRA) as an entity that furnishes consumer reports, and defines "consumer

21

reports" as information communicated by a CRA.[6]  The Complaint sets forth abundant facts showing the plausibility of these elements of the McCalmonts' claims.

### A.  The McCalmonts Have Sufficiently Pled The Existence Of A "Consumer Report."

The Complaint expressly avers that Fannie Mae generates a Desktop Underwriter Findings Report, and that report is a "consumer report" per the meaning of the FCRA. [EOR at 210, ¶ 93].

The FCRA defines a consumer report as:  (1) any written, oral, or other communication of any information by a consumer reporting agency (2) bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living (3) which is used or expected to be used or collected in whole or in part (4) for the purpose of serving as a factor in establishing the consumer's eligibility for generally, credit, insurance or employment purposes; or (C) any other purpose authorized under Section 1681*b*.  *See* 15 U.S.C. § 1681*a*(d)(1).  The McCalmonts' Complaint pleads facts sufficient to show each of these necessary elements.

---

[6] Having determined that Fannie Mae did not meet other elements of the definition of "consumer reporting agency," the district court did not reach the issue of whether the Desktop Underwriter Findings Report at issue here constitutes a "consumer report" under the FCRA.  However, because the two terms are defined in a mutually dependent manner, they must be construed together and both will be discussed here.

First, a consumer report is information communicated to a third party. *See* 15 U.S.C. § 1681*a*(d) (consumer reports involve "written, oral, or other communications or any information"). *See also Nunnaly, Jr. v. Equifax Information Services, LLC*, 451 F.3d 768, 772 (11th Cir. 2006). In the case *sub judice*, the Complaint states in detail that Fannie Mae communicated information to prospective mortgage lenders and/or brokers about the McCalmonts:

> Fannie Mae's [Desktop Underwriter] system assembles, reviews, assesses and evaluates all of the information it obtains from the lender and/or broker, and the consumer reporting agencies and/or resellers, including the consumer reports, and generates its own report known most frequently as the Desktop Underwriting Findings report ("DU Findings Report").

[EOR at 195-96, ¶ 22]. *See also* [EOR at 199, 200, 203, ¶¶ 40, 49, 64] (identifying three prospective lenders to whom DU Findings Reports were communicated by Fannie Mae).

Second, a consumer report is information bearing on a consumer's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681*a*(d)(1). Since the scope of the definition is exceedingly broad and a report need only bear on one of these seven factors, a wide variety of information about a consumer satisfies this part of the definition of a consumer report. *See*, *e.g.*, *Trans Union Corp. v. Fed. Trade*

*Comm'n*, 245 F.3d 809, 813 (D.C. Cir. 2001).[7] The Complaint outlines the extensive information included in the reports generated by Fannie Mae that bear on the McCalmonts' credit worthiness, credit standing *and* credit capacity. [EOR at 196, ¶ 23].

Third, the FCRA provides that consumer reports involve information "used or collected in whole or in part for" various listed purposes. *See* 15 U.S.C. § 1681*a*(d). That is, if a CRA expects a user to use a report for a listed purpose *or* if the CRA collected the information in the report for a listed purpose, the report is a consumer report even if the user applies the report to a different purpose. The consumer need only show that a report meets one of these criteria: that the report was "used," "expected to be used," *or* "collected" for a listed purpose. *See*, *e.g.*, *Yang v. Gov't Employees Ins. Co.*, 146 F.3d 1320, 1323-24 (11th Cir. 1998).[8]

---

[7] The FCRA's scope in this regard is broader than many consumer credit statutes because it is not just concerned with consumer *credit* reports but with information reported on individuals concerning their personal lives. For instance, reports about renters' evictions, rental payment histories, or treatment of premises relate to character, general reputation, personal characteristics, and mode of living. *See Ortiz v. Lyon Mgmt. Group, Inc.*, 69 Cal. Rptr. 3d 66, 68 (Cal. Ct. App. 2007). Likewise, a list of consumers who have passed bad checks would also be covered, since the list reflects on the consumer's general reputation. *See* 93 F.T.C. 909 (1979).

[8] For example, if the only purpose for which the information was used was to discredit the consumer in the community, the information was not used for a purposes listed in the Act's definition of a consumer report. Nevertheless, the consumer can show that the information is a consumer report if she can prove that the information was collected for use in connection with one or more of those purposes. That is, the CRA may have collected the information to help a user

Here, the Complaint abundantly details how Fannie Mae's Desktop Underwriter system generates reports intended to be used by lenders in determining whether to originate a mortgage loan or not:

> Fannie Mae exerts a tremendous influence on each step of the [mortgage] application process. Through its automated underwriting system that it requires lenders to use throughout the country, Fannie Mae obtains, reviews and evaluates consumer credit information in advance of loan origination for its own underwriting purposes; charges lenders, brokers and consumers for this information through the generation and publication of consumer reports; and dictates to lenders and consumers the outcome of mortgage loan applications, including rates and terms.

*See*, *e.g.*, [EOR at 191, ¶ 2].

Finally, to be a consumer report, information must be collected, used or expected to be used at least in part for the purpose of serving as a factor in establishing the consumer's eligibility for consumer credit or insurance, or for employment purposes. See 15 U.S.C. § 1681*a*(d). For instance, a statement that a check guarantee company has no negative information on the consumer but will not guarantee the check communicates a message intended to be used by the merchant in deciding whether to accept the check; as such, the statement constitutes a consumer report. *See Holmes v. Telecheck Int'l, Inc.*, 556 F.Supp.2d 819, 832-33 (M.D. Tenn. 2008).

---

decide whether to employ that consumer (*i.e.* a listed purpose). In either case, the information was collected for a listed purpose and, therefore, it constitutes a consumer report.

The instant Complaint alleges with great specificity the impact that Fannie Mae's Desktop Underwriter Findings Report has in the mortgage loan origination process:

> Fannie Mae requires that mortgage brokers and lenders submit residential mortgage applications through its Desktop Underwriter automated underwriting system ("DU") in order to get a quick approval or denial, the best lender/broker pricing, higher debt-to-income ratios, higher loan-to-value ratios, better loan programs not available outside DU, and risk-based pricing, before any commitment is made to the prospective borrowers.

*See*, *e.g.*, [EOR at 195, ¶ 18].

On a virtually identical complaint arising from virtually identical facts, the District of Arizona concluded that all of the foregoing elements of the definition of "consumer report" were satisfied for purposes of surviving a Rule 12(b)(6) Motion to Dismiss:

> Whether Plaintiffs can prove that Defendant violated the Act is a question for a future day, but there is little room for doubt that Fannie Mae's actions fall within the scope of the Act's protection.

*Zabriskie v. Federal National Mortgage Association*, *et al.*, unreported, 2:13-cv-02260, D. AZ (J. Bolton, April 17, 2014) (a copy of which is attached hereto as Exhibit 1 pursuant to FRAP 32.1) at 7, 8. The McCalmonts should be afforded the right to prove their allegations just like the *Zabriskie* plaintiffs.

**B.**     **The Complaint Sets Forth Facts Sufficient To Show Fannie Mae Is A "Consumer Reporting Agency."**

The Complaint directly alleges that Fannie Mae is a "consumer reporting agency." *See*, *e.g.*, [EOR at 193, ¶ 8]. ("Fannie Mae is a 'consumer reporting agency' as that term is defined by Section 1681a(f) of the FCRA."). But it states significantly more than that, setting forth facts showing how Fannie Mae's conduct here satisfies the statutory definition.

The FCRA defines "consumer reporting agency" as:

- any person which, for monetary fees, dues, or on a cooperative nonprofit basis
- regularly engages in whole or in part
- in the practice of assembling or evaluating consumer credit information or other information on consumers
- for the purpose of furnishing consumer reports to third parties.

15 U.S.C. § 1681*a*(f).[9] Facts sufficient to demonstrate the plausibility of each of these elements have been pled with specificity in the Complaint.

First, a CRA assembles information for monetary fees, dues, or on a cooperative nonprofit basis. *See* 15 U.S.C. § 1681*a*(f). The Complaint includes numerous allegations that Fannie Mae requires lenders and/or brokers to pay for

---

[9]   The statutory definition also requires the use of "any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." *See* 15 U.S.C. § 1681*a*(f). Fannie Mae licenses software through which mortgage lenders and/or brokers have access to the nationwide electronic Desktop Underwriter system thereby satisfying this element. [EOR at 195, ¶ 19].

each Desktop Underwriter Finding Report that is prepared.  [EOR at 191, 195, 199, 200, 203, 204, ¶¶ 2, 19, 40, 49, 64, 67].

Second, entities that "regularly engage" in consumer reporting-type activities. *See* 15 U.S.C. § 1681*a*(f).  The Complaint avers "Fannie Mae has entered into contracts with numerous mortgage lenders throughout the United States which, in exchange for its advance commitment to buy mortgage loans from these lenders in the secondary market, allow it to dictate the underwriting terms and conditions of most of the conventional conforming loans that these lenders originate." [EOR at 194, ¶ 17]. *See also* [EOR at 195, 197, ¶¶ 18, 2] ("Fannie Mae "compiles, issues, maintains and sells its DU Findings Reports to lenders and/or brokers on a nationwide basis[.]").  These allegations provide sufficient factual basis to suggest Fannie Mae regularly engages in the alleged consumer reporting activities.

Third, as touched on in Section II, *supra*, the definition of "consumer reporting agency" involves "assembling *or* evaluating" information reported to third parties.  *See* 15 U.S.C. § 1681*a*(f).  The instant Complaint alleges that Fannie Mae does much more than merely regurgitate information it receives about the consumer.  *See*, *e.g.*, [EOR at 191, 195-196 ¶¶ 2, 22]. Not only does the Complaint set forth that Fannie Mae "assembles, reviews, assesses and evaluates" the information it obtains from the lender and other sources about the consumer, it

describes that Fannie Mae offers its own findings, conclusions, comments and recommendations about the consumer's eligibility for particular mortgage loan terms.  [EOR at 196, ¶ 23].

Finally, to be a CRA, an entity assembles or evaluates consumer information "for the purpose" of furnishing consumer reports.  *See* 15 U.S.C. § 1681*a*(f).  As discussed above, the purpose of Fannie Mae's Desktop Underwriter system is to allow Fannie Mae, through the Desktop Underwriter Findings Report, "to dictate the underwriting terms and conditions" of the mortgage loans it intends to purchase.  *See*, *e.g.*, [EOR at 194, ¶ 17]. *See also* [EOR at 195, ¶ 18].

Again, on a virtually identical complaint arising from virtually identical facts, the *Zabriskie* court ruled that all of the foregoing elements of the definition of "consumer reporting agency" were satisfied for purposes of surviving a Rule 12(b)(6) Motion to Dismiss.  *See Zabriskie*, *supra*, at 7-8.  In so doing, the court commented that allowing a claim to proceed against Fannie Mae in this circumstance "is in line with the purpose" of the FCRA:

> As several Circuit Courts of Appeal have noted, Congress enacted the FCRA in recognition of the large impact a credit report can have on a person's life by affecting her access to employment and credit.  *See*, *e.g.*, *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153-54 (9th Cir. 2009); *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 981-82 (7th Cir. 2004); *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414-15 (4th Cir. 2001).   To protect consumer's interests, Congress enacted the FCRA "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."  *Safeco Ins. Co. of Amer. v. Burr*, 551 U.S. 47, 52 (2007).  To that end, Congress embodied in

the language of the statute its finding that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S. C. § 1681(a)(4).

*Zabriskie*, *supra*, at 8.

## CONCLUSION

The McCalmonts' Complaint is rich with facts plausibly suggesting that Fannie Mae is a consumer reporting agency subject to the mandates of the FCRA in connection with the preparation of its Desktop Underwriter Findings Report for sale to lenders and/or brokers throughout the United States for purposes of assisting in the evaluation of a consumer's eligibility for a residential mortgage loan. The district court improperly rejected these well-pled facts, opting instead to rely on "evidence" it conclusively accepted as fact on a motion to dismiss. To do so flies in the face of the Rule 12(b)(6) standard and constitutes clear error. For all the reasons enumerated above, the McCalmonts respectfully ask this Court to reverse the dismissal of their Complaint.

## STATEMENT OF RELATED CASES

The McCalmonts are not aware of any related cases pending in this Court at this time.

Dated this 20th day of May, 2015.    Respectfully Submitted,


   */s/ Sylvia A. Goldsmith*
Sylvia A Goldsmith (OH Bar No. 0064871)
**GOLDSMITH & ASSOCIATES, LLC**
Park West Building
20545 Center Ridge Rd., Suite 120
Rocky River, OH 44116
Tel: (440) 934-3025
Fax: (440) 934-3026
E-mail: goldsmith@goldsmithlawyers.com

Paul B. Mengedoth (AZ Bar No. 018507)
**MENGEDOTH LAW PLLC**
20909 N. 90th Place, Suite 211
Scottsdale, AZ 85255
Tel: (480) 778-9100
Fax: (480) 778-9101
E-mail:  paul@mengedothlaw.com

*Attorneys for Plaintiffs-Appellants*
*James and Katherine McCalmont*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and accurate copy of the foregoing ***Plaintiffs-Appellants James and Katherine McCalmont's Opening Brief*** is being filed electronically with the United States Court of Appeals for the Ninth Circuit on this 20th day of May, 2015. Notice of this filing will be transmitted to counsel of record by operation of the Court's electronic filing system.

*/s/ Sylvia A. Goldsmith*
Sylvia A. Goldsmith, Esq.
**GOLDSMITH & ASSOCIATES, LLC**

*Attorney for Plaintiffs-Appellants*

**Form 6.     Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

☒ this brief contains <u>7,385</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains_____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒ this brief has been prepared in a proportionally spaced typeface using *(state name and version of word processing program)* <u>Microsoft Word 2011</u> *(state font size and name of type style)* <u>14 Times New Roman</u> *, or*

☐ this brief has been prepared in a monospaced spaced typeface using *(state name and version of word processing program)* _____ with *(state number of characters per inch and name of type style)* _____ .

Signature | s/Sylvia A. Goldsmith

Attorney for | James and Katherine McCalmont

Date | 5/20/2015